



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 18, 2018**

United States Bankruptcy Judge

---

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Albert Wade Black,** | § | Case No. 17-32430-hdh7 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| **Lakeland West Capital XXIII, LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 18-03029-hdh** |
| | § | |
| **Albert Wade Black,** | § | |
| | § | |
| Defendant. | § | |

| | | |
|---|---|---|
| **William T. Neary,** | § | |
| **United States Trustee** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 18-03036-hdh** |
| | § | |
| **Albert Wade Black,** | § | |
| | § | |
| Defendant. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On March 9, 2018, Lakeland West Capital XXIII, LLC ("Lakeland") filed a complaint initiating the first above-captioned adversary proceeding against Defendant Albert Wade Black (the "Debtor"). On March 20, 2018, William T. Neary, the United States Trustee for Region 6 (the "Trustee"), filed a complaint initiating the second above-captioned adversary proceeding against the Debtor. In Lakeland's *First Amended Complaint Objecting to Dischargeability and Objecting to Discharge* ("Lakeland's Complaint"),[1] Lakeland seeks a global denial of the Debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A), (3), (4)(A), (5), and (7),[2] and an exception to discharge under 11 U.S.C. § 523(a)(2)(B) because Lakeland alleges the Debtor (i) transferred property of the Debtor to an insider within one year before the date of filing his bankruptcy petition, with the intent to hinder, delay, or defraud a creditor, (ii) failed to keep or preserve adequate financial records necessary to ascertain the Debtor's financial condition, (iii) knowingly and fraudulently made false oaths or statements in connection with this bankruptcy case, (iv) failed to satisfactorily explain a loss or deficiency of assets, and (v) submitted a false financial statement, in writing, respecting the Debtor's financial condition, on which the creditor who extended the Debtor credit reasonably relied. In the *United States Trustee's Complaint Objecting to Discharge* (the "Trustee's Complaint"),[3] the Trustee joins Lakeland in seeking a denial of the Debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A), (3), and (4)(A).

On June 5, 2018, Lakeland filed *Lakeland West Capital XXIII, LLC's Motion to Try Cases Jointly* (the "Joint Trial Motion").[4] The causes of action pled by Lakeland and the Trustee

---

[1] Case No. 18-3029, Docket No. 27.

[2] Lakeland's Complaint asserts several causes of action under 11 U.S.C. § 727(a)(7). Lakeland omitted this cause of action in its first proposed *Joint Pretrial Order* [Case No. 18-3029, Docket No. 19] and second proposed *Joint Pretrial Order* [Case No. 18-3029, Docket No. 28]. Because the pretrial orders were never entered, the Court will address Lakeland's arguments under section 727(a)(7).

[3] Case No. 18-3036, Docket No. 1.

[4] Case No.18-3029, Docket No. 6.

(together, the "<u>Plaintiffs</u>") involve common issues of fact and law. For this reason, and because counsel for all parties agreed, the Court granted Lakeland's Joint Trial Motion on June 6, 2018.

The Court conducted a joint trial in the above-captioned adversary proceedings over two days in October 2018. After trial, the Court took the matter under advisement. The following are the Court's Findings of Fact and Conclusions of Law for both above-captioned adversary proceedings, issued pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7052.[5] For the reasons set forth in greater detail below, the Court finds and concludes that, in this case, sufficient evidence has been presented to support denial of the Debtor's discharge under 11 U.S.C. § 727(a)(4)(A).

## JURISDICTION AND VENUE

This Court has jurisdiction over the parties and the claims asserted in these proceedings under 28 U.S.C. § 1334. These adversary proceedings involve a core matter under 28 U.S.C. § 157(b)(2)(I) and (J), as they involve a determination as to the dischargeability of a particular debt and a general objection to discharge. Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

## I. FINDINGS OF FACT

### A.    General Background

The Debtor is an individual who filed for relief under chapter 11 of the Bankruptcy Code on June 23, 2017. The Debtor is well-educated. He received an undergraduate degree from Texas A&M University in petroleum engineering and economics in 1987, and a master's degree in

---

[5] Any Finding of Fact that more properly should be construed as a Conclusion of Law shall be considered as such, and *vice versa*.

business administration from Southern Methodist University in 1993. He received his real estate license in 1988.

The Debtor filed for bankruptcy because of, among other things, an adverse judgment. On or about April 21, 2008, AWB Interests Marine, LLC ("AWB Marine") borrowed $2,315,000 from Bank of America (the "Note") to finance the purchase of a luxury yacht. The Debtor, as the sole beneficiary of the A. Wade Black Revocable Trust (the "Debtor's Trust" or the "Trust"), indirectly owns 100% of AWB Interests, Inc. ("AWB Interests"), which, in turn, wholly owns AWB Marine. When AWB Marine borrowed $2,315,000 from Bank of America, the Debtor personally guaranteed the Note.

AWB Marine did not satisfy all of its obligations under the Note and filed for chapter 11 bankruptcy on March 16, 2015. On June 29, 2015, Bank of America obtained a judgment against the Debtor based on his guarantee of the Note. During AWB Marine's bankruptcy, Lakeland purchased the debt of Bank of America. Lakeland, as successor to the interests of Bank of America and current legal owner and holder of the judgment, has filed an amended proof of claim in the Debtor's bankruptcy case asserting a claim of $1,505,115.57.

In addition to the Debtor's direct and indirect interests in the Trust, AWB Interests, and AWB Marine, the Debtor is involved in numerous other interrelated entities that have complex business transactions and family involvement.

For the past 25 years, the Debtor has served as the CEO of his family's business, SevenBar Aviation ("7Bar"). 7Bar provides aeromedical emergency transport services to hospitals nationwide and currently has around 100 employees. 7Bar is currently owned by the Debtor, Seven Bar Enterprises ("SBE"), and Front Range Capital (the "New Investors").[6] The Debtor was

---

[6] The New Investors received an equity interest in 7Bar after the company's recapitalization in November 2014.

the CEO of 7Bar at the time he filed his bankruptcy petition but had not been receiving a salary prior to his petition date due to 7Bar's recent financial troubles.

Bridgeway Aviation Partners, Ltd. ("Bridgeway Partners"), is a limited partnership that currently leases two aircraft to 7Bar. Bridgeway Enterprises Inc. ("Bridgeway Enterprises") is the General Partner and 1% owner of Bridgeway Partners. The Debtor's Trust owns 48% of Bridgeway Partners, and the Debtor's sister, Ms. Stephanie Black, and her partner, Ms. Linda Epps, own the remaining 51% of Bridgeway Partners.

The Debtor is currently divorced but was married to Ms. Renata Black at the time he filed his bankruptcy petition. Ms. Black did not file a joint petition for bankruptcy relief. The Debtor's divorce proceedings had been ongoing for eight years, but the divorce became final during the pendency of the bankruptcy in June of 2018. The Debtor currently lives with his fiancé and their two minor children in a house in North Dallas valued in the Debtor's schedules at $2,700,000.

**B.    The Debtor's Schedules and Statements of Financial Affairs**

The Debtor filed numerous sets of schedules and Statements of Financial Affairs during his bankruptcy. The Debtor made various amendments in an attempt to cure omissions and inaccurate or incomplete information. The Debtor also testified at several meetings held pursuant to 11 U.S.C. § 341. In the interest of clarity, the Court briefly catalogues the various schedules and statements the Debtor filed, each amendment, and each section 341 meeting.

On July 14, 2017, the Debtor filed his first set of schedules (the "Original Schedules")[7] and Statement of Financial Affairs ("Original SOFA").[8] The Original Schedules included Schedules A/B, C, D, E/F, G, H, I, and J.

---

[7] Case No. 17-32430, Docket No. 20.

[8] Case No. 17-32430, Docket No. 21.

On August 1, 2017, the Debtor testified under oath at the first meeting of the creditors ("First 341 Meeting").

On August 6, 2017, the Debtor filed his first set of amendments to his schedules (the "First Schedule Amendment").[9]   The First Schedule Amendment included an amended version of Schedule E/F and was filed in response to inaccuracies raised by the Trustee at the First 341 Meeting.

On September 1, 2017, the Debtor filed his second set of amendments to his schedules (the "Second Schedule Amendment").[10]   The Second Schedule Amendment included amended versions of Schedules A/B, D, E/F, and H.  On the same day, the Debtor also filed his first amended Statement of Financial Affairs (the "First Amended SOFA").[11]

On September 6, 2017, the Debtor testified under oath at the second meeting of the creditors ("Second 341 Meeting").

On October 30, 2017, the Debtor filed his third set of amendments to his schedules (the "Third Schedule Amendment").[12]  The Third Schedule Amendment included an amended version of Schedule A/B.  On the same day, the Debtor also filed his second amended Statement of Financial Affairs (the "Second Amended SOFA").[13]

The Debtor's chapter 11 case was rife with problems.  On November 1, 2017, the Court ordered the appointment of a chapter 11 trustee in the Debtor's bankruptcy case.  The Court noted in its oral ruling that "[t]he creditors need an honest picture of the Debtor's affairs and assets.  The

---

[9] Case No. 17-32430, Docket No. 32.

[10] Case No. 17-32430, Docket Nos. 38, 39, and 41.

[11] Case No. 17-32430, Docket No. 40.

[12] Case No. 17-32430, Docket No. 60.

[13] Case No. 17-32430, Docket No. 61.

prepetition activities and transfers need to be looked at by a disinterested person, a Trustee.  I did not get the impression today that Mr. Black would be able to fulfill his fiduciary duties in that area."  During that same month, the Debtor revoked his Trust.

The Debtor's case converted from chapter 11 to chapter 7 on December 8, 2017.  Pursuant to Local Bankruptcy Rule 1019-1, the Debtor was required to file, within 14 days of conversion, a schedule of those assets remaining in the possession of the Debtor as of the date of conversion.

On January 23, 2018, approximately six weeks after conversion, the Debtor filed his fourth set of amendments to his schedules (the "Fourth Schedule Amendment").[14]  The Fourth Schedule Amendment included amended versions of Schedules A/B, C, D, E/F, G, H, I, and J.  On the same day, the Debtor also filed his third amended Statement of Financial Affairs (the "Third Amended SOFA").[15]

On January 25, 2018, the Debtor testified at the chapter 7 meeting of the creditors ("Third 341 Meeting").  The Third 341 Meeting was continued to March 13, 2018, and reset to March 23, 2018.

On March 12, 2018, the Debtor filed his fifth set of amendments to his schedules (the "Fifth Schedule Amendment").[16]  The Fifth Schedule Amendment included amended versions of Schedules A/B and I.  On the same day, the Debtor also filed his fourth amended Statement of Financial Affairs (the "Fourth Amended SOFA").[17]

---

[14] Case No. 17-32430, Docket No. 103.

[15] Case No. 17-32430, Docket No. 103.

[16] Case No. 17-32430, Docket No. 125.

[17] Case No. 17-32430, Docket No. 126.

By any measure, it is this Court's experience that the Debtor filed a large number of schedules and statements of financial affairs, all of which were supposed to be true and correct and are signed under penalty of perjury.

**C.     Specific Allegations of Lakeland and the Trustee**

**1.   False Oaths**

The Plaintiffs allege the Debtor made numerous false oaths and accounts by failing to disclose properties or the value of certain properties on his schedules and statements of financial affairs, and by making false statements during his sworn 341 meetings.  Specifically, Lakeland's Complaint alleges 25 instances where the Debtor made false oaths, and the Trustee's Complaint alleges nine.  The Court makes its findings as follows:

***(a) Debtor's Failure to Disclose Income and Projected Income***

The Plaintiffs allege the Debtor failed to disclose the amount and sources of income on his Schedule I included in the Original Schedules and the Fourth Schedule Amendment.  The Debtor averred in his Schedule I included in the Original Schedules and the Fourth Schedule Amendment that his gross income was $0.00, and that he did not regularly receive income from any source.  He did, however, list that he received distributions totaling $146,000 from January 1 of the current year until the date he filed for bankruptcy on his Original SOFA.  At the First 341 Meeting, the Debtor clarified that the distributions were from Bridgeway Partners, and he would amend his Schedule I to reflect this information.  The Debtor continued to receive about $15,000 in monthly distributions post-petition from June through October 2017.  The Debtor did not amend his Schedule I to reflect these distributions until the Debtor filed his Fifth Schedule Amendment.  So, from August 1, 2017 until spring of the following year, the information on file as to his income remained inaccurate.

The Trustee further alleges the Debtor failed to disclose projected income from 7Bar.  The Debtor stated on his Schedule I included in the Original Schedules and the Fourth Schedule Amendment that he did not expect an increase or decrease in his income within a year.  At the First 341 Meeting, the Debtor explained he had agreed to "forgo" his salary from 7Bar "to save some jobs" because the company was struggling.  But the Debtor also claimed that he was confident 7Bar was on target and he anticipated his salary would be reinstated "pretty quickly."  The Debtor filed his Fifth Schedule Amendment months later, stating "Debtor expects to have salary reinstated in 2018."  At trial, the Debtor testified that when he filed his chapter 11 bankruptcy petition, he was anticipating and hoping his salary would be reinstated, but it was not definite.  7Bar reinstated his salary in December of 2017.  The Debtor should have disclosed he expected his salary to increase on his Original Schedules.

### (b) Debtor's Failure to Disclose Pledge of 7Bar Stock and Value of Stock

The Plaintiffs allege the Debtor made false oaths by stating he did not know the value of his 2,874,864 shares of 7Bar, and by failing to list his recent pledge of his 7Bar stock.  After 7Bar's recapitalization, the company lost a significant contract and had several cash calls to address its negative cash flow. The Debtor was unable to make the cash calls.  Instead, the Debtor pledged 1,990,000 Class A Units in 7Bar to secure a $995,000 promissory note to 7Bar dated August 31, 2015 and pledged his remaining 124,864 Class A Units in 7Bar to secure a $301,498 promissory note to 7Bar dated March 2017.  The Debtor testified at trial he did not disclose the stock pledge because he understood it as a guaranty, not a transfer.

At trial, the Debtor also stated he still technically owns approximately 72% of 7Bar.  But he maintained his ownership interest in 7Bar was "unknown" on his schedules because the New Investors had some warrants, which, if exercised, would dilute his interest in 7Bar to about 13%.

If the New Investors did not exercise its warrants, the Debtor's ownership interest would remain. The Debtor should have disclosed what percentage of 7Bar he owned, and he should have disclosed the pledge of stock.

### (c) Debtor's Failure to Disclose a JP Morgan Chase Account

The Plaintiffs allege the Debtor failed to list a personal JP Morgan Chase account on his Original Schedules and Original SOFA. In the Original Schedules and Original SOFA, the Debtor claimed the only deposits of money he had were in accounts at Wells Fargo and Bank of America. The Debtor later disclosed his JP Morgan Chase account on his Fourth Amended SOFA, but in that disclosure stated that the account was closed when he filed for bankruptcy. At trial, the Debtor admitted it was his fault he did not disclose the personal account in the first instance. However, he also admitted that the bank account was open at the time he filed for bankruptcy, that he deposited money into that bank account on the same day he filed for bankruptcy, that he used the account two weeks into his bankruptcy filing, and that he did not disclose the use of these funds on his monthly operating reports. The Debtor should have disclosed this account in his Original Schedules and should have properly disclosed that the account was not closed when he filed for bankruptcy. Information about the account and the use of the funds should have been part of his monthly operating reports.

### (d) Debtor's Failure to Disclose his New Mexico Lots

The Debtor failed to list real estate he owned in New Mexico (the "New Mexico Lots") on his Original Schedules through his Fourth Schedule Amendment and testified at the First 341 Meeting that he had no interest in any real estate in the state of New Mexico and that he owned no other real estate other than his homestead. At trial, the Debtor claimed the New Mexico Lots are of very little value, and it was an oversight that he did not disclose them in his schedules. The

Debtor testified at trial that his ownership of the New Mexico Lots came to his attention before he filed his Fourth Schedule Amendment, but he did not disclose them until later. The Debtor eventually listed New Mexico Lots on the Schedule A/B included in his Fifth Schedule Amendment, but did not identify where they are other than to say "vacant lots in New Mexico." The Debtor should have disclosed the New Mexico Lots on his Original Schedules.

### (e) Debtor's Failure to Disclose Sale of Interests in BC Wetlands

The Plaintiffs claim the Debtor failed to list a sale of his interest in BC Wetlands in 2016 in his Original SOFA. AWB Interests owned an 11% interest in BC Wetlands—a partnership that had property in southeast Oklahoma. The Debtor claimed he sold the interests to a Mr. Bob Tonti for $380,000 to help fund the Debtor's litigation, and later disclosed this on his Fourth Amended SOFA. At trial, the Debtor agreed it would be more accurate for the Fourth Amended SOFA to say AWB Interests, not the Debtor, sold the 11% interest in BC Wetlands. The Debtor also agreed that the sale price was $270,000, not $380,000.

### (f) Debtor's Failure to List Contingent Interest in the Albany Lot

The Plaintiffs allege the Debtor failed to list his contingent ownership interest in certain real estate (the "Albany Lot") located in the Bahamas. The Albany Purchase Agreement lists the Debtor's Trust and his father's trust (the "A. Rolfe Black Trust") as purchasers of the Albany Lot. The Debtor was required to pay a total price of $1.5 million, in addition to closing costs, but he defaulted after paying only $500,000. The Debtor testified that he entered into a contract to buy the Albany Lot in 2010, but that it was an installment contract and the Debtor was unable to fulfill his obligations under the contract. The Debtor further testified that he did not own the Albany Lot because he never took title, and he defaulted on the payments before closing.

### *(g) Debtor's Failure to List Contingent Interest in Empowered by You*

The Plaintiffs allege the Debtor failed to list his contingent interest in Empowered by You, LLC ("EBY") on his Original Schedules and any of the amended schedules.  EBY is a lingerie company owned and operated by the Debtor's ex-wife, Ms. Renata Black.  When the Debtor filed for bankruptcy, he was operating under a Contingent Mediated Settlement Agreement (MSA) with his ex-wife.  The MSA provided the Debtor would receive a 25% ownership stake in EBY if the Debtor and his ex-wife were able to satisfy certain conditions.  The Debtor claimed he did not list these interests because currently he has no ownership in EBY, and he was in default of the MSA. The Court believes the Debtor prevails on this point.

### *(h) Debtor's Failure to Disclose Oil Painting*

The Plaintiffs allege the Debtor failed to disclose the value of an oil painting and made a false oath by listing the value of his personal property at $50,000.  The Debtor listed in his Original Schedules that he had $50,000 in household goods and furnishings, including art.  The Debtor averred on Schedule A/B included in his Original Schedules that he did not own any "collectibles of value."  At the First 341 Meeting, the Debtor testified that he had "a couple pieces" of artwork that were "not worth anything," but at the Third 341 Meeting, the Debtor testified that he had an oil painting for which he thought he paid about $15,000.  At trial, the Debtor indicated that he may have actually paid $35,000 for the painting.  While the Debtor agreed art typically increases in value, he did not believe this painting increased in value since its purchase.  The Court does not believe the Debtor made a false oath with respect to the oil painting and valuation of his personal property, but he did make a false statement during his First 341 Meeting.

### (i) *Debtor's Failure to Disclose Trust Bank Accounts*

Lakeland alleges the Debtor failed to disclose his Trust's bank accounts at Frost Bank and Texas Capital Bank when the Debtor filed his Fourth Schedule Amendment. The Debtor revoked his Trust in November 2017, and his bankruptcy converted to chapter 7 on December 8, 2017. The Debtor should have disclosed his Trust's bank accounts when he tardily filed his Fourth Schedule Amendment after the case converted to chapter 7.

### (j) *Other Assets, Transfers, Interests, and Values of Interests*

Lakeland alleges the Debtor made additional false oaths, a few of which the Court will not address. For instance, the Debtor failed to disclose $28,000 he received from selling his football tickets in his Original SOFA. The Debtor should have listed these personal assets and transfers in his Original Schedules and Original SOFA. The Debtor did not disclose an interest in his grandparents' trust in his Original Schedules, but he did list an interest in his grandparents' trust of unknown value in the Schedule A included in the Second Schedule Amendment. At trial, the Debtor claimed that his interest in his grandparents' trust ceased to exist long ago.

### 2. Concealment and Transfer of Property

The Plaintiffs allege the Debtor transferred property with the intent to hinder, delay, or defraud a creditor, within one year before filing his bankruptcy petition. On December 15, 2016, the Debtor assigned his interests in Seven Bar Interests, LLC; Black Development Two, LLC; Black Ranch, LLC; and Brangus, LLC to his father, A. Rolfe Black. The Debtor listed these transfers on his Original SOFA under No. 18, and averred he received "Debtor forgiveness" in exchange. These transfers occurred during the same month the Debtor defaulted on a payment owed to Lakeland as a part of its judgment.

On or about November 10, 2016, the Debtor executed a $2.5 million promissory note in favor of his father, A. Rolfe Black. The Debtor testified his family prepared the note, and he signed it in another attempt to satisfy his debt to his parents. The Debtor claimed he was still unsure how much he owed his parents, and whether the note and transfers satisfied the debt he owed his parents. The Debtor's father has filed an amended proof of claim in the Debtor's case for $3,474,295. No party has objected to this claim.

### 3. Failure to Maintain Records

The Plaintiffs allege the Debtor failed to keep records with which creditors could ascertain his true financial condition or business transactions. Specifically, Lakeland claims the Debtor failed to keep or preserve recorded information of his bank statements, his records of indebtedness to his parents, his transactions with 7Bar, his ownership interest in The Albany, and other real and personal property. The Trustee claims the Debtor provided no documentation regarding the assignment of his interest in the Albany Lot to a Mr. Jeremy Davis.

The Debtor testified he did not keep records concerning the indebtedness to his parents, and although he could not recall what he used his parents' money for, he believed part of it was used for 7Bar. The Debtor did produce numerous bank statements, Personal Financial Statements, and tax returns to the Plaintiffs. He also produced tax returns for AWB Interests and provided some documentation regarding the Albany Lot transaction and transactions with 7Bar.

### 4. Failure to Explain Loss of Assets

Lakeland alleges the Debtor has failed to explain and reconcile the approximate $29.5 million loss of overall net worth he sustained over a period of three and a half years, with the income, monies, and gifts he's received from the A. Rolfe Black Trust, 7Bar, and Bridgeway Partners. On December 20, 2013, the Debtor's Personal Financial Statement showed he had an

overall net worth of $26,092,014.99.   As of May 1, 2017, the Debtor's Personal Financial Statement showed a negative net worth of $4,483,064.12.

### 5.  False Financial Statements

Lakeland asserts the Debtor submitted a false financial statement, in writing, to Bank of America, upon which Bank of America reasonably relied in extending its loan and entering into a forbearance agreement with the Debtor and AWB Marine.   The Debtor and Bank of America entered into a Loan Agreement on April 21, 2008.   The Loan Agreement had a maturity date of April 23, 2013.   The Debtor and Bank of America amended the Loan Agreement on April 23, 2013, modifying the maturity date to August 23, 2013.  On August 23, 2013, the parties amended the maturity date to January 2, 2014.

On or about December 20, 2013, the Debtor submitted a Personal Financial Statement to Bank of America that made the following representations:

- Net worth was $26,092,014.99
- Albany Lot and Membership worth $1,400,000
- A. Wade Black Revocable Trust had assets worth $24,886,591.52
- AWB Interests had assets worth $4,438,226.00
- Art and Collectibles worth $200,000

Bank of America later entered into a Forbearance Agreement with the Debtor on September 29, 2014.  Bank of America agreed to forbear from exercising its rights and remedies under the Loan Agreement until October 31, 2014.

## II. CONCLUSIONS OF LAW

### A.  False Oath (Trustee Count 1, Lakeland Count 4)

The Court will deny the Debtor's discharge under section 727(a)(4)(A) if the Debtor knowingly or fraudulently makes a false oath or account in connection with the bankruptcy case. A showing of a "false oath" requires the Plaintiffs prove, by a preponderance of the evidence,

"(1) [the Debtor] made a statement under oath; (2) the statement was false; (3) [the Debtor] knew the statement was false; (4) [the Debtor] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *See Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005). Fraudulent intent can be established "through the cumulative effect of a large number of falsehoods in a debtor's schedules as evidence of a reckless disregard for the truth." *Benchmark Bank v. Crumley (In re Crumley)*, 428 B.R. 349, 366-67 (Bankr. N.D. Tex. 2010).

The Plaintiffs have identified numerous inaccurate statements and omissions the Debtor made under oath. The Debtor did not have to disclose his interests in the Albany Lot or EBY because he did not actually own them, and he did not have to disclose the sale of BC Wetlands because it was owned by a separate legal entity.[18] The Debtor should have, however, made a number of additional disclosures in his Original Schedules and Original SOFA, including those regarding (i) the monthly distributions he was receiving from Bridgeway Partners, (ii) his expected increase in income from 7Bar, (iii) what percentage of 7Bar he owned, (iv) that he pledged his interests in 7Bar to secure promissory notes, (v) his personal JP Morgan Chase Account, (vi) the New Mexico Lots, and (vii) $28,000 he received from football ticket sales. After converting his bankruptcy case to chapter 7, the Debtor also should have disclosed his Trust's bank accounts at Frost Bank and Texas Capital Bank because he dissolved his Trust just before his case converted to chapter 7. It is also significant that even after all of the amendments to the Debtor's schedules and statement of financial affairs, they are still not accurate. For instance, the Debtor discloses that he has an interest in his grandparent's trust, but he testified at trial that such interest ceased to

---

[18] *See* Judgment Factors, L.L.C. v. Packer (*In re* Packer), 816 F.3d 87, 94 (5th Cir. 2016) (noting that a debtor is required to disclose ownership interests in different legal entities but need not disclose their assets or transactions).

exist long ago. In addition, the disclosure regarding BC Wetlands identifies the wrong selling party and the wrong sale price.

At trial, the Debtor testified that he received a copy of every schedule and amendment, and that he spent time preparing his schedules. He claimed to have gone through "a lot of information." But when questioned by the Plaintiffs regarding the numerous discrepancies and omissions in his schedules, and the delays in receiving his response or amendments, the Debtor claimed twice that he just "had a lot going on." The Debtor later stated that he did the best that he could with the amount of time that he had and that he just wanted to get through this. While mere mistakes are not normally grounds for denial of discharge, numerous mistakes can be compounded to find the Debtor acted with reckless disregard for the truth. Here the Court finds the Debtor acted with reckless disregard for the truth in making numerous false statements in his schedules and statements of financial affairs, to support denial of discharge under section 727(a)(4)(A).

## B. Concealment and Transfer of Property (Trustee Count 2, Lakeland Count 2)

Under section 727(a)(2)(A), the Court will deny the Debtor's discharge if the debtor has, with intent to hinder, delay, or defraud a creditor, transferred or concealed property of the debtor, within one year before the date of filing the petition. Under section 727(a)(7), a Court may deny discharge if the Debtor committed an act under section 727(a)(2), "on or within one year before the date of the filing of the petition, or during the case, in connection with another case . . . concerning an insider." As previously discussed, the Debtor transferred interests to his father within a year before filing bankruptcy. The Plaintiffs must prove, however, that the Debtor did so with the intent to hinder, delay, or defraud a creditor. The Court is not convinced the Plaintiffs have satisfied their burden of proof on this count.

The Debtor disclosed these transfers in his Original SOFA.  At the Second 341 Meeting and during the conversion hearing in November 2017, the Debtor stated he made these assignments of interests to his father for monies he owed to his parents.  He stated his parents loaned him approximately $3 million over about a 30-year period, and that he believed he received some credit for these transfers but had not yet met with his family to determine the exact value of the credit.

The Trustee alleges Debtor provided no reasonable explanation for the timing of the transfers, which occurred within six months of the Debtor filing bankruptcy.  At trial, the Debtor testified his family was angry with him over the money he owed, and to keep the peace he transferred these interests.  The Debtor did not want to sue his family to recover the transfers but gave Lakeland permission to initiate a fraudulent transfer action.[19]  The Court finds the Debtor's explanation credible on this point, and the Plaintiffs have not satisfied their burden of proof that the Debtor transferred these interests with the intent to hinder, delay, and defraud a creditor.

### C.  Failure to Maintain Records (Trustee Count 3, Lakeland Count 3)

Under section 727(a)(3), the Court will deny the Debtor's discharge if the Plaintiffs show the Debtor unjustifiably concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information from which their financial condition or business transactions might be ascertained.  The Debtor's "financial records need not contain 'full detail,' but 'there should be written evidence' of the [D]ebtor's financial condition." *Judgment Factors, L.L.C. v. Packer (In re Packer)*, 816 F.3d 87, 94 (5th Cir. 2016).

---

[19] Lakeland initially filed a fraudulent transfer action in state court and removed it to this Court on July 17, 2017.  The Court granted Lakeland's Amended Motion to Abate Action because Lakeland believed the Chapter 7 Trustee would substitute as the Plaintiff or seek to recover the transfers.

The Plaintiffs allege the Debtor failed to keep and provide adequate records to ascertain the Debtor's financial condition.[20]  As to the Debtor's personal financial records, the Court believes the Debtor produced enough information and documents for the Plaintiffs to try and understand his financial affairs.  The Debtor was under no obligation to keep records as to his interests in 7Bar or his Trust since these were separate legal entities.  *See Packer*, 816 F.3d at 94. Moreover, the Debtor's Trust, not the Debtor, contracted to purchase the Albany Lot in 2010.  The Debtor did produce some records as to these transactions, and the Plaintiffs do not prevail simply because the Debtor did not maintain records regarding the transfers and promissory note owed to his father.  The Court finds the Plaintiffs have not presented sufficient evidence to satisfy their burden and deny discharge on this count.

### D.  Failure to Explain Loss of Assets (Lakeland Count 5)

The Court will deny the Debtor's discharge under section 727(a)(5), if the Debtor "has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities."  Lakeland "bears the initial burden to produce some evidence of the disappearance of substantial assets or of unusual transactions" and then the burden shifts "to the debtor to provide a satisfactory explanation." *Crumley*, 428 B.R. at 371.

Although the Debtor received several monetary gifts from his parents and distributions from Bridgeway Partners, the Court believes the Debtor adequately explained the loss in his overall net worth.  The Debtor testified that 7Bar was recapitalized, and the business was not doing as well as it had been in previous years.  He also testified what many of his expenditures were for, and what assets were lost or depreciated in value.  The Court believes the Debtor's testimony is enough for him to prevail on this count.

---

[20] Lakeland also alleges denial of discharge under section 727(a)(7) on this count.

### E.  False Financial Statements (Lakeland Count 1)

Under section 523(a)(2)(B), an individual does not receive a discharge from a debt for money to the extent it was obtained by use of a statement in writing (i) that was materially false, (ii) respecting the Debtor's financial condition, (iii) upon which the creditor to whom the Debtor was liable for such money reasonably relied, and (iv) that the Debtor caused to be made with an intent to deceive.  Because the Debtor is being denied his discharge entirely under section 727(a)(4), the Court does not reach this request for a determination that Lakeland's specific debt is nondischargeable.

## III. CONCLUSION

The Plaintiffs did not present enough evidence to prove that the Debtor transferred property with an intent to hinder, delay, or defraud creditors.  The Debtor provided credible explanations for why assets were transferred, and, more generally, for why his net worth decreased in the years preceding his bankruptcy case.  In addition, while there are many transactions for which additional documentation would be helpful, the parties to most of the transactions at issue were entities owned directly or indirectly by the Debtor, but not the Debtor himself.  The bigger problem in this case was with the accuracy of the Debtor's disclosures.

The Debtor's financial affairs were both complex and extensive.  Nevertheless, the bankruptcy system relies on cooperation from debtors to learn about their assets, liabilities, and general financial affairs.  Without such self-reporting, the system simply could not operate efficiently and effectively.  The disclosures required in this case were extensive.  But the Debtor is a sophisticated party, and the required disclosures would have been significantly greater if so much of the Debtor's business had not been conducted in the name of his trust and other entities.

Throughout this bankruptcy case, information from the Debtor has come at a drip, with piecemeal disclosures regarding his past and present income, his real estate holdings and transactions, his bank accounts, important dates, and his varied business interests. That is one of the reasons a Chapter 11 Trustee was appointed. Many items and transactions, even when disclosed, needed more detail, explanation, clarification, or correction, and some of the required corrections and additional disclosures were only made months after they were brought to the Debtor's attention.

Even after six rounds of schedules, five rounds of statements of financial affairs, and four 341 meetings, the Trustee and Lakeland were still learning new information at trial. Numerous minor items on the schedules are still incomplete or inaccurate, which is surprising given how much attention the schedules and statements of financial affairs have received by this time and what was on the line at trial.

The Debtor took the position at trial that he disclosed more than was necessary to appease Lakeland and the Trustee. The problem was that even after multiple rounds of examining the Debtor's disclosures, they are not reliable. New information that should have been disclosed was being discovered throughout the case, and the information that was disclosed changed over time, even as late as trial a year and a half after the Original Schedules and the Original SOFA were filed.

The Court understands that this process can be a demanding one, and the Court understands that debtors have other things going on in their lives that require their time and attention. At some point, however, debtors who wish to receive a discharge in a bankruptcy case must find the time to satisfy their duties under the Bankruptcy Code, and that did not happen in this case.

###END OF FINDINGS AND CONCLUSIONS###